In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

---

# No. 22-2911

---

**ROBERT DEKELAITA,**

**Petitioner-Appellant,**

**v.**

**UNITED STATES OF AMERICA,**

**Respondent-Appellee.**

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 18 CV 6682 — Matthew F. Kennelly, *Judge.*

---

# BRIEF OF THE UNITED STATES

---

MORRIS PASQUAL
Acting United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

STUART D. FULLERTON
Assistant United States Attorney

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT .................................................... 1

ISSUEs PRESENTED FOR REVIEW ............................................ 2

STATEMENT OF THE CASE ......................................................... 2

    I.    Offense Conduct ...................................................... 2

        A.    Dekelaita's Role in the Conspiracy ................................. 3

        B.    Interpreters' Role in the Conspiracy .............................. 5

    II.    Indictment .............................................................. 8

    III.    Trial .......................................................................... 8

        A.    Rawa Jibrail ........................................................... 8

        B.    Rafida Jabo-Cordova ............................................. 11

        C.    Louay Kouza ........................................................ 18

        D.    Nahail Najam ...................................................... 19

        E.    Hilal Albqal ......................................................... 20

        F.    Saad Salman ....................................................... 21

        G.    Salman Salman .................................................... 22

        H.    Sabah Mosa ......................................................... 23

        I.    Raman Esho ........................................................ 24

        J.    Other Trial Evidence ........................................... 25

    IV.    Verdict, Sentence, and Direct Appeal .............................. 26

    V.    Section 2255 Proceedings ............................................ 27

A.    Motion and Evidentiary Hearing ................................. 27

B.    Post-Hearing Briefs ...................................................... 28

C.    Denial of Section 2255 Motion ................................... 31

D.    Denial of Motion for Reconsideration ......................... 36

SUMMARY OF ARGUMENT ............................................................. 38

ARGUMENT ...................................................................................... 39

I.    The District Court Properly Denied Dekelaita Relief Under
§ 2255 Because Any Undisclosed Benefit Was Not Reasonably
Likely To Have Led to a Different Outcome. ..................................... 39

A.    Standard of Review ...................................................... 39

B.    Analysis ........................................................................ 39

1.    The District Court Did Not Abuse Its Discretion In
Denying § 2255 Relief, Given Recorded Evidence,
Testimony That Client-Witnesses Expected To Remain In
the United States, and Significant Other Impeachment. ........ 39

2.    Dekelaita's Efforts To Find Error In The District Court's
Materiality Determination Fail ................................... 46

II.    The District Court Properly Denied § 2255 Relief Based on
Dekelaita's Additional Claims That Agents Assisted Client-
Witnesses and Others Before Trial, Where Those Claims Were
Untimely and Immaterial. .............................................................. 51

A.    Standard of Review ...................................................... 51

B.    Background ................................................................... 51

C.    Analysis ........................................................................ 52

1.    The District Court Did Not Err In Concluding That
Dekelaita's Claims Regarding Purported Pre-Trial
Benefits Did Not "Relate Back" To His § 2255 Motion. ........... 52

2.    Dekelaita's Claims Regarding Purported Pre-Trial Benefits
      Fail On The Merits......................................................................... 57

      a.    Cordova's Naturalization Application ................................ 57

      b.    Jabo-Cordova's I-130 Application ...................................... 60

      c.    Kejbou ................................................................................... 61

      d.    Esho ...................................................................................... 62

CONCLUSION ............................................................................................. 63

# TABLE OF AUTHORITIES

## CASES

*Anderson v. United States*, 981 F.3d 565 (7th Cir. 2020) ................................ 56

*Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019) ............................................ 54

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................*passim*

*Coleman v. United States*, Appeal No. 22-1678, 2023 WL 5212586 (7th Cir. Aug. 15, 2023) ............................................................................ 51, 52, 54

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................. 40

*Holland v. Florida*, 560 U.S. 631 (2010) ........................................................ 53

*Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020) .................................................. 61

*Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343 (7th Cir. 2015) . 52

*Mamedov v. Barr*, 2021 WL 781743 (E.D.N.Y. Mar. 1, 2021) ......................... 60

*Mayle v. Felix*, 545 U.S. 644 (2005) ........................................................ 52, 54

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................... 28, 33, 38, 61

*Price v. Thurmer*, 514 F.3d 729 (7th Cir. 2008) ............................................ 61

*Price v. Thurmer*, 514 U.S. 419 (1995) .................................................... 49, 50

*Shelton v. Marshall*, 796 F.3d 1075 (9th Cir. 2015) ........................................ 59

*Simental v. Matrisciano*, 363 F.3d 607 (7th Cir. 2004) ................................... 43

*Torry v. Northrop Grumman Corp.*, 399 F.3d 876 (7th Cir. 2005) ................... 55

*United States v. Bagley*, 473 U.S. 667 (1985) ...................................... 40, 48, 49

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ................................... 42

*United States v. Davis*, 29 F.4th 380 (7th Cir. 2022) ...................................... 62

*United States v. DeKelaita*, 875 F.3d 855 (7th Cir. 2017) .......................*passim*

iv

*United States v. Howard*, 179 F.3d 539 (7th Cir. 1999) ................................. 47

*United States v. Jackson*, 780 F.2d 1305 (7th Cir. 1986) ............................... 50

*United States v. Johnson*, No. 6:14-CR-00482-MC, 2019 WL 267875 (D. Or. Jan. 17, 2019) ............................................................................................. 50

*United States v. Jones and Schimenti*, Nos. 21-1482 & 21-1672, 2023 WL 5319244 (7th Cir. Aug. 18, 2023) ................................................ 40, 42, 46, 59

*United States v. Jumah*, 599 F.3d 799 (7th Cir. 2010) ................................... 40

*United States v. King*, 910 F.3d 320 (7th Cir. 2018) ...................................... 43

*United States v. Morales*, 746 F.3d 310 (7th Cir. 2014) ................................ 39

*United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001) ................................... 50

*United States v. Salem*, 578 F.3d 682 (7th Cir. 2009) .................................... 41

*United States v. Silva*, 71 F.3d 667 (7th Cir. 1995) ....................................... 40

*United States v. Vargas-Garnica*, 332 F.3d 471 (7th Cir. 2003) ................... 53

*United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996) ............................... 50

*Williams v. United States*, 879 F.3d 244 (7th Cir. 2018) ............................... 39

*Wood v. Milyard*, 566 U.S. 463 (2012) .......................................................... 56

## STATUTES

8 U.S.C. § 1158 ................................................................................................... 3

18 U.S.C. § 371 ......................................................................................... 1, 8, 41

18 U.S.C. § 1546(a) ......................................................................................... 26

18 U.S.C. § 1622 .............................................................................................. 26

18 U.S.C. § 3231 ................................................................................................. 1

21 U.S.C. § 851 ................................................................................................ 54

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 2253(a) ............................................................. 2

28 U.S.C. § 2255 ............................................... 1, 27, 53, 56

28 U.S.C. § 2255(a) ............................................................. 2

28 U.S.C. § 2255(f)(1) ........................................................ 53

## RULES

Federal Rule of Civil Procedure 15(a)(2) ............................. 52

Federal Rule of Civil Procedure 15(c) .......................................*passim*

## REGULATION

8 C.F.R. § 1208.16 ............................................................... 3

## JURISDICTIONAL STATEMENT

Petitioner-Appellant's jurisdictional statement is not complete and correct.

On August 4, 2014, Robert Dekelaita was charged in a second superseding indictment in *United States v. Dekelaita*, 14 CR 497 (N.D. Ill.), with federal offenses related to fraudulent asylum applications. CR 136.[1] A jury convicted Dekelaita of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; and the district court sentenced Dekelaita on March 22, 2017, before entering its final judgment on March 27, 2017. CR 247, 291, 293. This Court affirmed Dekelaita's conviction on November 17, 2017. *United States v. DeKelaita*, 875 F.3d 855 (7th Cir. 2017). Regarding these criminal proceedings, the district court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court had jurisdiction pursuant to 28 U.S.C. § 1291.

On October 1, 2018, Dekelaita filed a motion to vacate his sentence under 28 U.S.C. § 2255, which the district court denied on September 22, 2022. CVR 1; App. 2-35. The district court issued a certificate of appealability.

---

[1] Citations to the Original Electronic Record on Appeal in the underlying criminal proceedings are designated as "CR," and citations to the Original Electronic Record on Appeal in the 28 U.S.C. § 2255 proceedings are designated as "CVR." The criminal trial transcripts are cited as "Tr.," and are available at CVR 310-21. The transcripts from the evidentiary hearing in the § 2255 proceedings are cited as "H. Tr.," and are available at CVR 142-49. Defendant's brief is cited as "Br.," and his appendix is cited as "App." Government exhibits are cited as "G. Ex." and are available at CVR 154. Document and page numbers follow each citation, as appropriate.

App. 34. On October 21, 2022, the district court denied Dekelaita's motion for reconsideration of the denial of his § 2255 motion. App. 36. Dekelaita timely filed his notice of appeal from the denials of his § 2255 motion and motion for reconsideration on October 21, 2022. CVR 133. Regarding the § 2255 proceedings, the district court had jurisdiction pursuant to 28 U.S.C. § 2255(a), and this Court has jurisdiction pursuant to 28 U.S.C. § 2253(a).

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in denying Dekelaita's § 2255 motion, where Dekelaita failed to show a reasonable likelihood that the verdict would have been different had jurors learned that client-witnesses understood, at the time of trial, that federal agents would be available to assist them, post-trial, on immigration-related matters.

2.      Whether the district court erred in rejecting some of Dekelaita's claims because (1) they were untimely, given that defendant neither raised them in his § 2255 motion nor amended his motion under Federal Rule of Civil Procedure 15(c); and (2) Dekelaita failed to show a reasonable likelihood that the verdict would have been different had the jury heard those claims.

## STATEMENT OF THE CASE

### I.      Offense Conduct

Starting in 2000 and continuing until 2011, immigration attorney Robert Dekelaita conspired with interpreters, his employees, his clients, and others to

defraud the United States by preparing and submitting fraudulent asylum applications on behalf of ineligible Assyrian or Chaldean Christian clients from Muslim-ruled countries, such as Iraq. R. 247; Tr. 304-05, 1915. Some of these clients were ineligible for asylum because they had not suffered injustices amounting to persecution. *E.g.*, Tr. 842-54. Others had lived, and/or had legal status, in safe countries outside of the Middle East. *E.g.,* Tr. 424-28, 495-97, 773-77.[2]

## A.    Dekelaita's Role in the Conspiracy

According to testimony from nine of Dekelaita's former clients, at initial meetings with Dekelaita, they told him about their backgrounds: where they came from, what they experienced in their home country (or the country in which they last lived), and when and how they entered the United States. *E.g.*, Tr. 423-28, 540-60, 770-76, 1003. They spoke with Dekelaita in Chaldean

---

[2] Under U.S. law, individuals from other countries who have suffered persecution, or fear future persecution, because of their race, religion, nationality, membership in a particular social group, or political opinion, and who have no citizenship or residency in another safe country, may be granted permission to remain in the United States indefinitely; may apply for permanent residency (a green card) after one year; and may apply for U.S. citizenship after five years. 8 U.S.C. § 1158; 8 C.F.R. § 1208.16; Tr. 51, 61, 66, 84-86. An asylum applicant must submit to United States Citizenship and Immigration Services ("USCIS"), a division of the Department of Homeland Security ("DHS"), an application signed by the applicant, the applicant's attorney, and an interpreter, if used, and then submit to an interview, at which the applicant's attorney may be present. Tr. 69-71, 72, 74-75. If the applicant does not speak fluent English, the applicant must bring an interpreter, who signs a form under penalty of perjury attesting that he will provide a true and accurate translation of the asylum officer's questions and the applicant's answers. Tr. 75-80.

and Aramaic. Tr. 424, 495, 511, 542, 573. In each case, Dekelaita expressed dissatisfaction regarding the client's chances of securing asylum with their true story and said he would create a fake story instead. Tr. 775 ("His response [was] that the story that I had told him, it's not going to be any good to apply for asylum, so we have to change some things."); Tr. 1206 ("He said . . . I'm going to write you a story, because the story you have, it's not going to be very useful because you're coming from Europe.").

Dekelaita, with assistance from others, submitted a fictitious claim to USCIS for each of the nine clients. *E.g.,* Tr. 429 ("He said that he will make up a story, . . . and . . . change some information as me being from Iraq instead of Sweden."); Tr. 1003 ("I told him I wanted to stay here, and so . . . he told me that . . . we must change your last name."). Dekelaita fabricated tales of rape, false arrests, murder, and torture—hallmarks of persecution. Tr. 110, 435, 447-49, 579-84, 784-85, 789-95, 842-49, 944-46, 988, 1210-13. Dekelaita also claimed (falsely) that clients supported the Assyrian Democratic Movement ("ADM"), an ethnic Assyrian political party in Iraq, and had been targeted due to their ADM affiliations. *E.g.,* Tr. 448, 579, 789-90, 843, 853, 956, 1025, 1139-40, 1210, 1273, 1383.

Dekelaita instructed some clients not to disclose their citizenship or legal status in other countries where they were not at risk for persecution because that made them ineligible for asylum. Tr. 414-16, 422-33, 533-36, 546-554, 773-

4

77, 994-97, 1003-04, 1116-23. For example, Dekelaita told one client: "Don't say anything about you are from Ecuador. Let's not talk about it" Tr. 554. He told another client: "[D]on't say I am German." Tr. 1122. Dekelaita stated on asylum applications that clients came directly from Iraq; altered their dates of travel; changed their last names to make it more difficult for USCIS to trace them to legal documents in foreign countries; and directed them to obtain false documents from Iraq. *E.g.,* Tr. 776 (Dekelaita said, "[W]e cannot use the same name in Canada and in the United States because they are neighboring countries, and they have lots of dealings with each other.").

## B.    Interpreters' Role in the Conspiracy

Dekelaita instructed clients to memorize the fictitious stories he crafted (*e.g.,* Tr. 434, 584, 778), but they were not always capable of doing so (*e.g.,* Tr. 587, 638-39, 645, 1214-15). One client explained: "[I]t was a long story, too many dates, and I was messing up." Tr. 587. Dekelaita solved this problem by arranging for the interpreters he hired to do more than accurately translate questions and answers during asylum interviews.[3]

Yousif Yousif and Adam Benjamin, two interpreters Dekelaita hired, helped clients memorize false information in their applications and provided

---

[3] For more common languages, such as Spanish, USCIS employs interpreter monitors, who participate telephonically in asylum interviews to verify the accuracy of the translation. But this practice did not begin until 2006 and, from 2006 to 2011, interpreter monitors typically were unavailable for less common languages, including the neo-Aramaic languages spoken by many of Dekelaita's clients. Tr. 75-78.

false translations at asylum interviews. *E.g.,* Tr. 205-13, 286-99, 347-57, 452, 585-87. Before each interview, Dekelaita gave Yousif or Benjamin the fictitious story, arranged for them to meet the client, and directed them to review the fictitious story with the client to prepare for the interview. *E.g.,* Tr. 453-54, 512-14, 585-94, 950-51. During pre-interview meetings, Dekelaita, Yousif, or Benjamin explained to the client that, if the client could not remember a particular detail during the interview, he or she should say a random phrase in neo-Aramaic—*e.g.,* "boil an egg"—and the interpreter would give the correct answer in English. *E.g.,* Tr. 454, 587-89, 1034-35, 1215. Dekelaita told one client: "[J]ust answer anything, and Yousif will fix it," and "[W]hen they ask you the question, [Yousif] will tell you the answer, and he will say, Don't forget to say this, don't forget to say that." Tr. 1215.

Then, at the asylum interview, in the presence of Dekelaita or one of his associate attorneys, Yousif and Benjamin falsely translated questions and answers. Sometimes, when translating the asylum officer's questions, the interpreters gave the client the answer. *E.g.,* Tr. 349-57, 454, 457, 599-601. At other times, they falsely translated "wrong" answers (*i.e.*, answers inconsistent with the fictitious story) to reflect the "correct" information. *Id.*

Fadhil Rasho, a former Dekelaita client who cooperated with the government, made consensual recordings of an asylum interview at which Benjamin provided false translations. Tr. 203-14; CR 267-1–267-5. Before

6

Rasho's interview, he and Dekelaita crafted a false story to make Rasho appear
eligible for asylum. Tr. 204-05, 219-21. Rasho was prepared for the interview
by Benjamin, and Benjamin told Rasho that, so long as Rasho spoke words in
neo-Aramaic or Arabic, Benjamin would help him. CR 267-1. Benjamin made
good on his promise during Rasho's October 22, 2008, asylum interview. For
example, Benjamin translated questions and answers as follows:

| | |
|---|---|
| [Asylum officer in English]: | Is there anywhere in Iraq which you could go and be safe? |
| Benjamin [Assyrian]: | Is there a safe place for you to live in Iraq or not? |
| Rasho [Assyrian]: | Yes, there's in Arbil.  Arbil . . . I mean in the North. |
| Benjamin [English]: | All Iraq even the North is no good for Christian.  He mentioned even Arbil is no good for Christian. It means no, no safe. |

CR 267-5; Tr. 284-99.

After receiving a report regarding Benjamin's false translations from one
of his associate attorneys, Alan Takhsh, Dekelaita continued to hire Benjamin.
Tr. 348-49, 353-57.

## II.   Indictment

On August 4, 2015, Dekelaita and Yousif were charged in an eight-count second superseding indictment. CR 136.[4] Pertinent to this appeal, Count One alleged that Dekelaita, Yousif, Benjamin, and others conspired to defraud the United States, including by Dekelaita preparing and submitting false asylum stories, and Yousif and Benjamin providing false translations during asylum interviews, in violation of 18 U.S.C. § 371. *Id.* at 1-14.

## III.   Trial

The district court severed the charges against Dekelaita and Yousif, and Dekelaita's case proceeded to trial in April 2016. CR 228. At the 12-day trial, the government presented testimony from the nine former clients, who testified as follows:

### A.   Rawa Jibrail

Jibrail moved with her family from Iraq to Sweden as a child, became a Swedish citizen, and grew up in Sweden. Tr. 413-15. After entering the United States as an adult on a visitor's visa in 2003, she and her father hired Dekelaita. Tr. 421-24. Jibrail and her father told Dekelaita that Jibrail was a Swedish citizen and showed him Jibrail's Swedish passport, which was in the name "Rawa Mansoor." Tr. 424-28, 495-97. They asked Dekelaita about

---

[4] On April 4, 2015, Benjamin pleaded guilty to conspiring with defendant to commit asylum fraud, as charged in an earlier iteration of the indictment. CR 78-79.

Jibrail's visa eligibility, but Dekelaita said the route most likely to secure legal status would be an asylum application falsely claiming that Jibrail was an Iraqi who suffered persecution in Iraq as a Christian. Tr. 429-30.

Dekelaita explained that Jibrail would have to conceal her Swedish citizenship and destroy her Swedish papers, and that he would change her last name from Mansoor (her family name, commonly used in Sweden or Western countries on personal identification documents) to Jibrail (the name on her Iraqi birth certificate). Tr. 425-33, 496-97. Doing this, Dekelaita said, would make it difficult for the U.S. government to link her to the Swedish passport that she used to enter the United States. Tr. 430.[5]

Dekelaita prepared an asylum application for Jibrail that falsely claimed that Jibrail had lived in Iraq until emigrating to the United States; she was only an Iraqi citizen; and her only valid passport came from Iraq. Tr. 436-51. The application listed residences in Iraq unrecognizable to Jibrail, but which Dekelaita instructed her to memorize. Tr. 434, 440-41. The personal statement attached to Jibrail's application claimed that, while in Iraq and because of her family's status as Assyrian Christians, Jibrail's father—the same man who accompanied Jibrail to meet Dekelaita—was dragged out of the house at night

---

[5] Jibrail's father, Jalal Mansoor, testified that Dekelaita said they should change Jibrail's home country from Sweden to Iraq, that "we would make her Assyrian because Assyrians are persecuted in Iraq," and that her asylum application would say that her parents were dead. Tr. 496-97, 507-10.

by the Amen, Iraq's security force, and had not been seen or heard from since. Tr. 444-46. The statement said Jibrail was forced to flee Baghdad; she was seized by the Amen, held for two days, and raped; and she was released only to be detained again for distributing literature against Islam, and raped, beaten, and threatened. Tr. 446-50. None of these things were true; Dekelaita made them up. Tr. 436-51. As Dekelaita knew, Jibrail was living in Sweden when these events purportedly occurred. Tr. 424-32.

Jibrail also testified that Dekelaita arranged for her to meet with Yousif the day before her asylum interview. Tr. 452-53. At this meeting, Yousif quizzed Jibrail on the asylum story and told her that, if she did not "remember, maybe I can say boil an egg or something in my own language and then he will translate it." Tr. 454. Jibrail spoke fluent English and Chaldean at the time, so she could assess the accuracy of Yousif's translations at her interview. Tr. 457. Yousif "translated" the questions inaccurately, adding details or suggesting answers, and also falsely "translated" Jibrail's answers. Tr. 457-58. On at least one occasion, Jibrail told Yousif in Chaldean that she did not remember the answer, and Yousif gave the asylum officer an answer in English consistent with Dekelaita's fictitious story. *Id.*

Jibrail's asylum application was granted on February 26, 2003. Tr. 458-59; CR 267-14. Jibrail applied for permanent residency in 2004, and as the jury heard, that application was granted in 2006. Tr. 420-21, 459-62; CR 267-14.

Jibrail testified that she understood her permanent-residency status could be revoked because she had "done something illegal and wrong" and the government had made no promises or representations about how her testimony would affect her status. Tr. 420-21. On cross-examination, based on the government's pre-trial disclosures, the jury learned that agents from DHS's Office of the Inspector General ("DHS-OIG") had asked USCIS to hold Jibrail's citizenship application in abeyance. Tr. 486. In this request, DHS-OIG explained that Jibrail was "the subject of an open criminal investigation" and that "evidence . . . indicates that Jibrail may have received her asylum through fraud." G. Ex. 13.

## B.    Rafida Jabo-Cordova

Jabo-Cordova is an Iraqi who left Iraq in 1995 when she was 19. Tr. 529. In 2002, she became an Ecuadorian citizen and renounced her Iraqi citizenship after marrying Ecuadorian citizen Francisco Cordova. Tr. 530-36. That year, she moved to the United States with Cordova and hired Dekelaita. Tr. 536-42.

At their first meeting with Dekelaita, Jabo-Cordova introduced Cordova as her husband. Tr. 540-60, 725-32. Jabo-Cordova told Dekelaita that she had temporary legal status in Switzerland and showed him her Swiss papers. Tr. 531-32, 543-47. Jabo-Cordova also told Dekelaita that she was an Ecuadorian citizen, showed him her Ecuadorian passport, and asked him if she could apply for a student or work visa. Tr. 547-52. Dekelaita said obtaining a

visa would be difficult, and the best way to secure legal status would be as an Iraqi asylee. Tr. 553. When Jabo-Cordova told Dekelaita that she had renounced her Iraqi citizenship and entered the United States on her Ecuadorian passport, Dekelaita asked if she had been fingerprinted at the border. Tr. 555. When Jabo-Cordova said no, Dekelaita assured her that the government would not find out about her Ecuadorian status. Tr. 553.[6]

Dekelaita submitted an asylum application claiming that Jabo-Cordova's name was "Rafal Khizme," she was unmarried, she had no claim to legal status in country other than Iraq, and she had been persecuted in Iraq as an Assyrian Christian. Tr. 569-84.

Dekelaita asked Jabo-Cordova to give him copies of her Iraqi identity documents, including her baptismal certificate, which she told him were in Ecuador at her mother-in-law's house. Tr. 557. When the mother-in-law faxed the certificate to Dekelaita, he saw the last name on it (Jabo) was in English, not Arabic; as a result, Dekelaita instructed Jabo-Cordova to obtain a fake, blank Iraqi baptismal certificate that Dekelaita filled in with the fictitious last name "Khizme" before submitting it to immigration officials. Tr. 558-66, 594-

---

[6] Asylum applicants are fingerprinted, and the government uses the fingerprints to check the applicant's criminal and immigration history. Tr. 72-73. If Jabo-Cordova were fingerprinted when she entered the United States using an Ecuadorian passport in her real name, the asylum officer would have compared information from the Ecuadorian passport to information on her asylum application. Tr. 73.

97. Dekelaita also arranged for Yousif to prepare a false translation of Jabo-Cordova's Iraqi documents. Tr. 558, 566-70. The documents are in the name "Rafida Jabo," but the translation said the documents are in the name "Rafal Khizme." Tr. 557-59, 566-70.

Dekelaita arranged for Yousif to interpret Jabo-Cordova's asylum interview, even though she spoke English. Tr. 586-87, 599-600. Accompanied by Dekelaita and Yousif, Jabo-Cordova reiterated the lies from her asylum application during the interview. Tr. 598-99. Yousif did not accurately translate all of the asylum officer's questions or all of Jabo-Cordova's answers; he "cover[ed]" for her during the interview when she did not "know an answer," including by adding dates and places. Tr. 584-91, 598-601.

Jabo-Cordova's asylum application was referred to the Executive Office for Immigration Review ("EOIR").[7] Tr. 601, 609. Before the scheduled hearing, a government attorney discovered that Dekelaita had submitted two Iraqi baptismal certificates for Jabo-Cordova: her real certificate, bearing an Ecuadorian fax number along the top edge from when the mother-in-law faxed it to Dekelaita; and the fake certificate that Dekelaita filled in with the name "Khizme." Tr. 606-09. When the government attorney questioned Jabo-Cordova about the Ecuadorian fax number at the hearing, Dekelaita requested

---

[7] If the asylum officer does not grant asylum after the interview, the case is referred to a judge at EOIR for a contested hearing. Tr. 87-89.

a break, told Jabo-Cordova that his secretary had made a mistake in submitting the real baptismal certificate, and directed Jabo-Cordova to lie. Tr. 609. Her asylum application was denied; Dekelaita filed an unsuccessful appeal and a motion to reopen; the motion to reopen was granted in 2005; and the case was remanded to immigration court for further proceedings. Tr. 167-68, 609-12; R. 267-14. Jabo-Cordova terminated Dekelaita's representation before issuance of the remand order. *Id.*

In 2006, Jabo-Cordova began cooperating with the government while her reopened asylum case was still pending in immigration court. Tr. 158-59, 167-68, 613. In 2010, Dekelaita re-contacted Jabo-Cordova. Tr. 614-17. At the government's direction, Jabo-Cordova re-hired Dekelaita to represent her in her continued asylum proceedings. Tr. 631. Jabo-Cordova covertly recorded conversations with Dekelaita and his associate attorneys, Takhsh and Alen Jacob, during which they discussed, among other things, her fraudulent asylum claim.[8] Tr. 158-91, 201-03, 631-57.

During a recorded conversation between Dekelaita and Jabo-Cordova on October 28, 2010, Dekelaita asked Jabo-Cordova if she was "still married" (even though he had stated she was unmarried in her still-pending asylum application) and inquired about her husband's status in the United States.

---

[8] The transcripts of Jabo-Cordova's recordings are available at CR 267-6–267-13.

Tr. 637; CR 267-6. Jabo-Cordova responded that her husband had a green card. *Id*. Dekelaita told Jabo-Cordova that she had to memorize her asylum story for the upcoming hearing. Tr. 638-39; CR 267-7. When Jabo-Cordova said she could not remember the story, Dekelaita told her: "If you say, It's not my story, someone else wrote it for me, you are going to get in big trouble. Okay? . . . . Don't do that. . . . [Y]ou have to read it. It's very simple." *Id*.  In response, Jabo-Cordova joked that, when "something doesn't happen truly, . . . you forget it." *Id*.

In the same conversation, Dekelaita instructed Jabo-Cordova to get a certificate from a church in Detroit with false information about her membership and attendance there. Tr. 639-42; CR 267-8. Jabo-Cordova said she did not attend that church because she lived in California, and asked what first name should be on the certificate, Rafida or Rafal. CR 267-8 at 1-2. Dekelaita responded that Jabo-Cordova needed this documentation in the Rafal name because, if she changed her story now, "[T]hey will say, Okay, fine, and then you can go back to Ecuador and wait until your husband becomes a citizen . . . ." Tr. 642; CR 267-8. At the end of this conversation, Jabo-Cordova asked Dekelaita if she needed to bring her Ecuadorian passport to court. *Id*. Dekelaita responded: "I am not . . . answering you the way I should. I, I don't know you are Ecuadorian. If I know you are Ecuadorian, we have to stop this [asylum] process." Tr. 642; CR 267-9.

15

In a recorded conversation on November 10, 2010, Jabo-Cordova and Takhsh, Dekelaita's associate, spoke about a fraudulent affidavit that Takhsh drafted at Dekelaita's direction to support her still-pending asylum application. CR 267-11; Tr. 335-38. The affidavit was from Salam Yaldiko, purportedly a board member of the Chaldean Federation of America, and it made claims about the date on which "Rafal Khizme" entered the United States.[9] CR 267-11; Tr. 335-47, 650-52. During this recorded conversation, Jabo-Cordova told Takhsh that she did not know who Yaldiko was. CR 267-11 at 3-4; Tr. 338-43, 650. Takhsh relayed this information to Dekelaita, and he responded that he would handle it. Tr. 343-44. After this conversation, Dekelaita, or someone at his direction, put the Yaldiko affidavit on Chaldean Federation of America letterhead, forged Yaldiko's signature, and mailed the affidavit from Dekelaita's office to Jabo-Cordova. Tr. 345-47, 650-52. The envelope Jabo-Cordova received was postmarked November 2010. Tr. 651-52.

On February 28, 2011, Dekelaita sent his associate Jacob to Detroit to prepare Jabo-Cordova for an immigration hearing the next day and to represent her in the proceeding. Tr. 655. Before her meeting with Jacob,

---

[9] Yaldiko testified that he lived in Iraq for all of 2010, when the affidavit was prepared and mailed to Jabo-Cordova. Tr. 757-62. In addition, by 2010, the Chaldean Federation of America had been disbanded, so Yaldiko was no longer a board member as stated in the affidavit. *Id.*

Dekelaita spoke with Jabo-Cordova by telephone and instructed that during

the hearing she had to

> stick[] to the same story because . . . anytime you change
> something and you come back and say, ["]Well, I'm sorry, you
> know, I lied, and you know, this and that.["] Even if God has told
> you, it doesn't matter. . . . [I]f, if you confess . . . it never works in
> your favor.

Tr. 653-54; CR 267-10.

Before trial, the government disclosed to defense counsel that Jabo-

Cordova was a long-time cooperator; because of her cooperation, USCIS had

provided Jabo-Cordova with deferred action status (allowing her to remain in

the United States); and DHS-OIG had told Jabo-Cordova that she was

permitted to stay in the United States so long as she was actively cooperating.

CVR 124 at 4; G. Exs. 20-22. At trial, the jury heard, from both parties, that

Jabo-Cordova had been permitted to remain in the United States, despite the

government's knowledge of her fraud. Tr. 229-30, 697-98. Jabo-Cordova also

testified that she intended to stay in the United States by seeking a green card

based on her husband's citizenship. Tr. 659-60, 697-98. Finally, the jury heard

that Jabo-Cordova remained in the United States even after her deferred-

action status expired—an event that took place in the middle of trial. Tr. 659,

1706-07.

### C.     Louay Kouza

Kouza was born in Iraq but left in approximately 1990. Tr. 768-69. He lived in Canada until emigrating to the United States in 2000 and had legal status in Canada under the name "Louay Zuhair Jajo." Tr. 770-76. When Kouza hired Dekelaita, Dekelaita said he would change Kouza's last name from "Jajo" to "Kouza" so that the United States would not find out about his Canadian status. Tr. 775-76.

Dekelaita prepared a fraudulent asylum application for Kouza and directed him to memorize it. Tr. 778. It claimed that Kouza lived in Iraq until 2000 and was persecuted there because of his Christianity and support of ADM. Tr. 778-85, 789-95. The application concealed Kouza's status in Canada. Tr. 782-83. Dekelaita also arranged for Yousif to translate for Kouza. Tr. 795-96. Before the asylum interview, Dekelaita explained to Kouza that Yousif had a copy of the asylum story and would help Kouza if he made a mistake with dates or names. *Id.*

Kouza's asylum application was granted in 2000. CR 267-14. In 2002, he applied for permanent residency in the United States, which was granted in 2010. *Id.* At trial, Kouza testified that he understood that he "could be deported from the United States . . . because there [were] many, many lies" and that the government had made "no promises or representations" about how his testimony might affect his immigration status. Tr. 772. On cross-examination,

Kouza also testified that he did not expect to be removed to Iraq: "Our lives are threatened in Iraq and it's impossible to send us back to Iraq unless the situation improves." Tr. 829-30.

### D.    Nahail Najam

Najam is from Iraq. Tr. 837. He entered the United States in 2006 and hired Dekelaita. Tr. 839-41. He told Dekelaita he worked at a liquor store in Iraq, his co-worker was killed, and he reported to the police threats made to the liquor store (but not to him personally) by Muslims. Tr. 842-43. Dekelaita drafted an asylum application that contained some truths but also lies. Tr. 842-54. For example, Dekelaita added false statements about Najam being a member of the ADM, his house being gunned down by Muslim extremists, and his name being added to a terrorist elimination list. Tr. 850-54.

Dekelaita arranged for Benjamin to translate for Najam and for Najam to meet Benjamin before the asylum interview. Tr. 846. Benjamin helped Najam memorize the fictitious story, and Benjamin told Najam that, if he did not know how to answer a question during the interview, Benjamin would help with the answer when he translated Najam's words to English. Tr. 847.

Najam's asylum application was granted in 2007, and he was granted permanent residency in 2009. CR 267-14; Tr. 1664-66. At trial, Najam testified that he could lose his permanent-residency status owing to the fraud he had committed, and the government had made him no promises assuring his

residency. Tr. 840, 871-72. On cross-examination, Najam also testified about his desire to remain in the United States. Tr. 928 ("I want to stay here. I wish, I wish.").

### E.  Hilal Albqal

Albqal is Najam's brother; Albqal left Iraq in 2008, moved to Syria, and entered the United States on a fraudulent visa in 2009. Tr. 939-41. During their first meeting, Albqal told Dekelaita that his house in Iraq was burned down owing to an electrical short. Tr. 944-45. Dekelaita responded: "The fact that your home was burned or had the fire, that's a good thing, but as much as you can, don't say that it was an electrical cause. Say that it was from another—from a party or from some extremist Islamics." Tr. 946. When he drafted Albqal's asylum application, Dekelaita included this false statement and also incorporated false statements from Najam's application, including that Najam's house was gunned down and Najam was associated with ADM. Tr. 947, 956-59.

Before his asylum interview, Albqal met with Dekelaita and Benjamin; Benjamin helped Albqal prepare for the interview and also helped Albqal during the interview, including by using hand gestures to communicate answers Albqal could not remember. Tr. 950-51, 960-61.

Albqal's asylum application was granted in 2009, and Albqal was granted permanent residency in 2011. CR 267-14. At trial, Albqal testified that

he understood he could lose his permanent-residency status because of fraud (Tr. 942); the government had made him no promises regarding his status (*id.*); and he did not want to return to Iraq (*id.* at 987).

### F.    Saad Salman

Saad Salman was born in Iraq but moved to Greece in 1990. Tr. 991-92. He later became an Australian citizen under the name "Saad Hummi" before moving to the United States. Tr. 994-97. He entered the United States on a visa, using his Australian passport. Tr. 998-99. He hired Dekelaita in 2001. Tr. 999-1003.

Saad told Dekelaita about his Australian citizenship, including that it was in the "Hummi" name. Tr. 1003. Dekelaita recommended a different last name—"Salman"—for his asylum application, so that the U.S. government could not link Saad to his Australian passport. Tr. 1003-05. Dekelaita prepared an application falsely stating that Saad had lived in Iraq until 2001 and was persecuted there; the application also concealed Saad's Australian citizenship, including by providing fictitious Iraqi addresses and employers. Tr. 1010-14, 1022-32. Dekelaita directed Saad to obtain fraudulent Iraqi baptismal papers for his children, who were born in Greece and Australia, which Dekelaita submitted to USCIS. Tr. 1006-09.

Dekelaita arranged for Yousif to translate for Saad. Tr. 1032-33. Before the asylum interview, Yousif helped Saad memorize the fictitious story and

told him that, for extra money, Yousif would help Saad during the interview by "extend[ing]" his answers. Tr. 1033-36.

Saad was granted asylum and, in 2006, permanent residency as well. Tr. 1036-38; CR 267-14. Before trial, the government disclosed that it had advised Saad that any one of the following might occur to his immigration status—removal, no change in status, or notification to USCIS of his cooperation—and the government could make no promises regarding his status given his fraud. CVR 124 at 2; G. Ex. 6. Saad testified at trial consistently with these disclosures (Tr. 1101-04), and on cross-examination, added that he wanted to remain in the United States but the government would decide his status (*id.*).

### G.    Salman Salman

Salman Salman is Saad Salman's brother; he was also born in Iraq but left in 1977. Tr. 1114-15. He lived in Germany for 26 years and became a German citizen in 1980, before moving to the United States in 2002. Tr. 1116-18. He hired Dekelaita on his brother's recommendation. Tr. 1119-20.

Salman told Dekelaita about his German citizenship, and Dekelaita responded that he should not say "I am German." Tr. 1121-23, 1129. Dekelaita told Salman that there were two possible fee arrangements: $3,000 would buy him an asylum story, but $5,000 would guarantee him asylum. Tr. 1124-25. Salman paid $5,000, which got him a fraudulent asylum application in the last

name "Salman," instead of "Hummi"; falsely stated that he was persecuted in Iraq because of his Christianity and ADM membership; and omitted his German citizenship and the fact that his children were German-born. Tr. 1123-29, 1135-43.

Salman's asylum application was granted in 2002. Tr. 1143; CR 267-14. In 2006, he filed for permanent residency and continued to claim that he was Iraqi, not German. Tr. 1143-44; CR 267-14. He applied for and received United States citizenship in 2011. Tr. 1145-46; CR 267-14. Before trial, the government disclosed to defense counsel that it had advised Salman that any one of the following might occur to his immigration status—removal, no change in status, or notification to USCIS of his cooperation—and the government could make no promises regarding his status given his fraud. CVR 124 at 3; G. Ex. 16. At trial, Salman testified that the government had informed him of these possibilities. Tr. 1119, 1195-96. When defense counsel asked Salman whether agents had told him "they could perhaps note to immigration that you were helping them with this investigation," Salman said "yes." Tr. 1195-96.

## H.    Sabah Mosa

Mosa was born in Iraq but left in approximately 1991 with his wife, Iklas Zaiya. Tr. 1201-03. They lived in various European countries from 1991 to 2001, entered the United States in 2001, and hired Dekelaita. Tr. 1202-06. Mosa and Zaiya told Dekelaita that they had been living in Europe, and

Dekelaita told them that because they did not have an asylum "story," he would create one. Tr. 1206, 1266-68. Their asylum application falsely stated that they left Iraq in 2001 after being persecuted owing to their Christianity and Mosa's ADM involvement. Tr. 1207-12.

Dekelaita arranged for Yousif to translate at Mosa's asylum interview. Tr. 1213-14. Mosa did not memorize the entire story, so Dekelaita told Mosa, "[J]ust answer anything, and Yousif will fix it." Tr. 1214-15.

Mosa's asylum application was denied after being referred to EOIR. Tr. 1216-19. At trial, Mosa testified that he remained in the United States due to "a withholding of removal." Tr. 1204 ("[T]hey have not deported me because the situation currently is not very good in Iraq."); *see also* Tr. 1264 (Zaiya testified about withholding of removal). Mosa testified that the government had made him no promises about his immigration status (Tr. 1204) and that he understood that he could be deported (Tr. 1222). On cross-examination, Zaiya testified that their family had lived in the United States "for at least 15 years" and would like to remain here. Tr. 1351-52.

## I. Raman Esho

Esho was born in Syria and imprisoned there in 1997. Tr. 1361-63. He was smuggled into the United States in 2000. Tr. 1363-64. When he hired Dekelaita, Esho told him where he was from and what happened to him in Syria. Tr. 1365-68. Dekelaita explained that, as a Syrian, Esho "may be able to

24

win the case through one hearing, two hearings, three hearings," but if Esho claimed to be Iraqi, "we can win the case in one hearing." Tr. 1368-69. Esho agreed to lie. Tr. 1370. Dekelaita arranged for Esho to receive a fake Iraqi ID and baptismal certificate, and Dekelaita submitted a copy of these papers to USCIS along with a fraudulent asylum application stating that Esho was born and lived in Iraq, where he was persecuted because he supported ADM. Tr. 1371-86.

Esho's asylum application was granted in 2001, his application for permanent residency was granted in 2006, and his citizenship application was granted in 2010. Tr. 1388-89; CR 267-14. Before trial, the government disclosed to defense counsel that it had advised Esho of the same three possibilities of which it had advised other cooperators—removal, no change in status, or notification to USCIS of his cooperation—and that the government had made no promises regarding the outcome. CVR 124 at 3-4; G. Exs. 17-18. The jury learned this information as well. Tr. 1750-52. Esho testified that he understood that he "could lose everything" because he "received [his citizenship] illegally" and that the government had made him no promises. Tr. 1364.

## J.    Other Trial Evidence

In addition to expert testimony about the asylum process (Tr. 46-89) and summary testimony about the clients' asylum files (Tr. 1661-1703), the government introduced testimony from associate attorney Takhsh, including

about Takhsh's work for Dekelaita on fraudulent asylum applications and Dekelaita's relationship with the interpreters, like Benjamin (Tr. 303-25, 334-62). The government also introduced the consensual recordings made by Rasho at his asylum interview, during which Benjamin mistranslated the asylum officer's questions and Rasho's answers. Tr. 203-14; CR 267-1–267-5.

## IV.    Verdict, Sentence, and Direct Appeal

On May 9, 2016, the jury found defendant guilty of the Count One conspiracy. Tr. 1915; CR 247.

The jury also found Dekelaita guilty of Counts Five through Seven (*id.*), which charged him with submitting asylum applications containing false statements of material facts, in violation of 18 U.S.C. § 1546(a) ¶ 1, and procuring perjury during asylum interviews, in violation of 18 U.S.C. § 1622. CR 136 at  16, 18-20. The district court later granted Dekelaita's motion for judgment of acquittal on those counts. CR 287.[10]

On March 22, 2017, the district court sentenced Dekelaita to a below-Guidelines term of 15 months' imprisonment. CR 291, 293.

---

[10] The government earlier dismissed Counts Two through Four, which charged Dekelaita with submitting asylum applications containing false statements of material facts and with procuring perjury during asylum interviews. CR 242, 244; Tr. 1715. The jury acquitted Dekelaita of Count Eight, which alleged that he conspired with others to commit marriage fraud.  Tr. 1915; CR 247.

On November 17, 2017, this Court affirmed Dekelaita's conviction. *DeKelaita*, 875 F.3d at 855.

## V.    Section 2255 Proceedings

### A.    Motion and Evidentiary Hearing

On October 1, 2018, Dekelaita filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255, arguing that his conviction on Count One was invalid. CVR 1, 3. Dekelaita argued that his former clients, turned government witnesses, received undisclosed benefits—namely, promises (either express or implied) that following trial, they would be allowed to remain in the United States despite their fraudulent asylum applications. CVR 3 at 3 ("Witnesses that testified at trial were rewarded for their testimony by being allowed to retain their admittedly fraudulent/frivolous Asylum Status.").[11]

The district court construed Dekelaita's claim as arising under the Fifth Amendment as well as *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963). CVR 8 at 5-6. The court held that Dekelaita's claim of undisclosed post-trial benefits was not procedurally defaulted because "the passage of time has been key to assessing whether an improper benefit was conferred on the witnesses." *Id.* at 6. The court concluded that "DeKelaita ha[d] articulated a plausible basis for his contention that government

---

[11] Defendant also raised other claims (CVR 1; CVR 3 at 3-4), which the district court rejected (CVR 8).  Defendant does not appeal those rulings.

witnesses were promised (and received) benefits that were not disclosed to the defense or the jury" and, therefore, an evidentiary hearing was needed to determine "who knew what when." *Id.* at 7.

That hearing took place over seven days in December 2020 and January 2021, and featured live testimony of approximately 20 witnesses and submission of deposition testimony from others. CVR 85, 87-88, 91, 94-96; App. 4. Witnesses included several client-witnesses and others related to them; Louis Chesla and Tyler Shoudy, DHS-OIG special agents; and officials with DHS, USCIS, and Immigration and Customs Enforcement. *Id.*

### B.   Post-Hearing Briefs

After the evidentiary hearing, the parties submitted post-hearing briefs. CVR 121, 124, 126.

In its post-hearing brief, the government summarized pre-trial disclosures made regarding any benefits provided, and representations made, to client-witnesses. CVR 124. In addition to reiterating the relevant disclosures and trial testimony (*id.* at 2-4), the government explained that, pre-trial, it disclosed Agent Chesla's grand jury testimony "in which the agent explained that no promises had been made but that the witnesses' cooperation . . . could be considered by the administrative agencies in charge of immigration matters in determining whether deportation was appropriate" (*id.* at 5).

The government's post-hearing brief synthesized the evidence from the hearing as follows:

- "As every single witness testified, there were no pretrial promises or agreements, explicit or tacit, regarding the immigration status of former Dekelaita clients." CVR 124 at 6.

- "[T]he government advised witnesses of multiple potential immigration results, including that the witness might not be deported." *Id.*

- "The possibility of witnesses remaining in the U.S. was specifically disclosed to the defense . . . and elicited by the defense at trial." *Id.* at 7.

- "[W]here the case agents and prosecutors have no authority over deportation and immigration status, . . . agents can only outline a range of possible outcomes without making any promises, and disclose their having done so—precisely as the agents did here." *Id.* at 8.

- With respect to non-naturalized client-witnesses, "[t]he vast majority . . . are in immigration limbo. They have not been granted a new, undisclosed status; they have the same status as they did at trial and their status is under review by the Fraud Detection and National Security Directorate (FDNS), an entity within USCIS that acts at the direction of the executive," "wholly independent of DHS-OIG." *Id.* at 8-9 (citing H. Tr. 599-600, 612, 616, 623).

- With respect to Esho and Salman, the two client-witnesses who were citizens, FDNS—with no DHS-OIG involvement—had decided not to seek their denaturalization. *Id.* at 12-13. That decision was not made due to their cooperation, but because of the "heavy lift of resources" involved in denaturalization. *Id.* (citing H. Tr. 623-24, 805).

- To the extent Agent Chesla made post-trial inquiries on client-witnesses' behalf (*e.g.*, asking USCIS whether client-witnesses could seek status through family members), there was no

benefit the government was required to disclose. *Id.* at 12. The inquiries were made after trial and, in any event, no client-witness's status changed as a result. *Id.*

Based on this evidence, the government argued that "no inference of a 'secret agreement' could be drawn from the fact of non-deportation, "when non-deportation was specifically disclosed as an option" and the jury learned of that fact. *Id.* at 7.

The government acknowledged that after Dekelaita's trial, numerous witnesses renewed their green cards, but argued that no evidence reflected that the government had made pre-trial promises that this would occur; the agents had no role in the renewal process; and in any event, the renewal of a green card provided no new immigration status. CVR 124 at 10. Client-witness Kouza—who maintained his green-card status following trial—testified that he communicated with Chesla post-trial to inquire about developments in the case and to ask him what form he needed to renew his green card. *Id.* (citing H. Tr. 270-73); H. Tr. 273-74. But Kouza still understood that "any time they [the government] can come and they can say, you have to leave." H. Tr. 272.

With respect to pending citizenship applications, the evidence showed that "DHS-OIG requested that Jibrail and Saad withdraw their citizenship applications" and "informed Kouza, Albqal, and Najam that they could not apply for citizenship." CVR 124 at 11 (citing H. Tr. 300-01, 726-27, 798-800, 807-08). DHS-OIG did so because an individual is ineligible for citizenship if

their permanent-residency status was obtained via fraud, and DHS-OIG could not permit additional fraud in the naturalization process. *Id.* (citing H. Tr. 800-02).

### C.  Denial of Section 2255 Motion

On September 22, 2022, the district court denied Dekelaita's § 2255 motion. App. 2-34. The court noted that "nearly five years after Dekelaita's trial, all of the client-witnesses . . . were still in the United States with legal status despite their admitted immigration fraud" and that with respect to Esho and Salman, "immigration authorities made an affirmative decision post-trial not to seek denaturalization." App. 5-6. However, the court found:

> [T]he evidence . . . does not support a finding that any affirmative decision was made not to institute removal proceedings against the client-witnesses. Rather, the reason for the government's inaction appears to be much more mundane: a combination of inertia and bureaucratic decisions.

*Id.*

More specifically, the court found that in some instances, Agent Chesla "did things that had the effect of forestalling the institution of removal proceedings." App. 6. The court pointed to Chesla's decision to keep the client-witnesses' A-files (alien-registration files) in DHS-OIG's possession, rather than providing them to FDNS, effectively delaying FDNS's review of those files

for potential removal. App. 7-9.[12] Still, the court concluded, there existed insufficient evidence to support a finding that the retention of the A-files "was done as part of a design or plan . . . that existed before Dekelaita's trial, let alone that any of the client-witnesses understood at the time of trial that Chesla would do anything along those lines." *Id.* at 6. *See also id.* at 7 (finding that the client-witnesses' retention of their "previous legal status" was not "the result of some design or understanding that existed at the time of Dekelaita's trial"); *id.* at 9 (finding no evidence that DHS-OIG agents "played any role" in immigration authorities' post-trial decision not to seek Esho's and Salman's denaturalization).

The court thus "overrule[d] Dekelaita's *Napue* claim:

> It founders on the very first element. Dekelaita has not shown that the witnesses' testimony that they had been given no promises about their future immigration status was false. As the Court has found, Dekelaita has not established that any promises were made about the witnesses' future status.

App. 28 (internal citations omitted).

It did the same with Dekelaita's *Brady* claim:

> [T]he evidence does not support a finding that the client-witnesses, or any of them, had any understanding or promise (express or tacit) *before trial* regarding any particular steps that the OIG

---

[12] Chesla testified that the A-files constituted trial evidence, DHS-OIG has an established procedure for documenting the witnesses' fraud and returning the physical file to USCIS, but that procedure stalled when the § 2255 petition was filed and the A-files again became relevant evidence. H. Tr. 775-84. The court did not credit this explanation. App. 8-9.

agents would take on their behalf or that any particular outcome would be obtained. There was no pretrial understanding that the agents would stall their deportation, that the agents or other authorities would enable them to stay in the U.S. indefinitely or even after any significant period, or that the witnesses would receive any actual consideration from immigration authorities regarding their status. So the fact that the government did not disclose this is of no consequence; it was not obligated to disclose promises that were not made.

App. 31 (emphasis in original).

But while the court concluded that agents never promised to forestall deportation, it found that, *post-trial*, agents provided "a number of the client-witnesses . . . advice, aid, and/or assistance." App. 10. For example, the court cited evidence indicating that Chesla told some client-witnesses that "he had no issue with renewal of their green cards" (App. 10-11);[13] submitted a letter to the Swedish embassy on one client-witness's behalf without expressly referencing the fraud underlying that client-witness's naturalization application (App. 11-14); and made (unsuccessful) inquiries to various immigration authorities on client-witnesses' behalf (App. 13). The court also pointed to efforts Chesla made, after being contacted by family members of client-witness Mosa, to prevent Mosa's wrongful deportation. App. 14-15. (The

---

[13] Yet the district court also found that "renewal of a green card is . . . a routine procedure that does not involve reexamination of the original basis for issuance of a green card." App. 11.

court recognized that Mosa was "entitled to remain in the U.S." because "an immigration judge had already granted withholding of removal." App. 15.)

With respect to Jabo-Cordova, the court found that Chesla took steps to facilitate her non-removal. For example, Chesla reviewed applications sent to him by Dalia Kejbou, another immigration attorney who represented Jabo-Cordova, containing false information regarding Jabo-Cordova's manner of entry into the United States. App. 17-26. By reviewing the applications, the district court found, Chesla provided "at least tacit approval" of their contents. App. 24-25.[14] Still, the court concluded that none of the evidence reflected any "*pretrial understanding* that Chesla or OIG would assist or condone a false application for immigration benefits" and that, instead, it was "much more likely that what happened was that, after Dekelaita's trial or after his appeal, agent Chesla was willing to look the other way" given Jabo-Cordova's cooperation. App. 26 (emphasis in original).

From this record, the court surmised that "the client-witnesses knew they could reach out to the OIG agents for assistance after the trial" and that agents, pre-trial, "had told them as much." App. 31. It wrote:

> The Court does not believe that it was simply happenstance that
> the witnesses . . . reached out to OIG and Chesla when they had

---

[14] The government argued in its post-hearing brief that Chesla reviewed Kejbou-prepared applications only to ensure they contained accurate information regarding Jabo-Cordova's cooperation; and that the government, including Chesla, "has no independent knowledge of how [Jabo-Cordova] entered the U.S." CVR 124 at 16-18.

> problems. . . . [T]he witnesses not only knew to reach out to the OIG agents; they knew how to reach the agents, and they were comfortable doing so even though the agents had investigated them for fraud.

App. 31-32. The court recognized that the client-witnesses' apparent "mutual understanding with the OIG agents that they would be available for assistance . . . did not include any guarantee, promise, or representation regarding any results." App. 32. But the court found that "witnesses had . . . an assurance that they have an 'insider' available and willing to help them on immigration-related matters," and the government had been obligated to disclose this understanding. *Id.*

The district court then turned its attention to materiality. App. 32. Recognizing that "[a] new trial is required if the defendant shows a reasonable likelihood that the outcome of the trial would have been different but for the error," the court concluded:

> Dekelaita has not shown that the undisclosed promise of assistance is material. As the government has argued . . . significant evidence entirely unrelated to the credibility of the client-witnesses supported the verdict. This includes, among other things, the testimony of Adam Benjamin, an interpreter also involved in the fraudulent activity; [Alen] Takhsh, an attorney who testified that he told Dekelaita about Benjamin's false transactions; and the recorded conversation between Jabo-Cordova and Dekelaita, in which he directed Jabo-Cordova to lie and conceal and to obtain false evidence to support her asylum application.
>
> In addition, there was plenty of evidence that *was* submitted at the trial to impeach the client-witnesses. The defense cross-examined

multiple witnesses about their desire to remain in the U.S. and the fact that their ability to do so was largely in the hands of the government. In addition, some of the witnesses, including Jabo-Cordova, were examined regarding benefits they had already gotten (for Jabo-Cordova, authorization to work in the U.S.).

What was *not* disclosed and thus unavailable to the defense for cross-examination was the fact that the client-witnesses understood that they could reach out to the OIG agents for assistance on immigration-related issues. The Court is not persuaded that Dekelaita has shown that this is material, in other words that disclosure of this (and the resulting ability to cross-examine about it) is reasonably likely to have made a difference in the outcome of Dekelaita's trial. This evidence is to a significant extent cumulative with respect to the credibility of each of the client-witnesses, whose credibility was significantly impeached in other ways. In addition, the promise did not involve an actual tangible benefit for any of the client-witnesses, but rather an offer of assistance (from an insider, to be sure) without any promise, implicit or otherwise, of a favorable outcome.

!

App. 32-33 (emphases in original).

The court concluded by issuing a certificate of appealability "because the issues presented in the case are fairly debatable and capable of a different resolution." App. 34.

### D.  Denial of Motion for Reconsideration

On October 21, 2022, Dekelaita moved for reconsideration. CVR 131. He argued that the district court "misstated the standard for evaluating prejudice under *Brady*" and failed to address other benefits Dekelaita claimed that client-witnesses received pre-trial. *Id.* at 5-11.

The district court denied Dekelaita's reconsideration motion the next day. App. 36. Regarding the contention that it ignored a subset of claims, the court referenced a portion of its original opinion in which it wrote that in addition to Dekelaita's contentions regarding "express or tacit assurances of future benefits":

> At various junctures during the hearing and since, Dekelaita has also referenced other information (regarding various matters that he potentially could have used to cross-examine certain of the client-witnesses) that he contends was not disclosed to him. The latter contentions were not part of Dekelaita's section 2255 motion, and thus a claim based on these contentions is not properly before the Court. That aside, none of that particular allegedly undisclosed information was material, even when viewed collectively.

App. 3-4.

> In declining to reconsider, the court added:

> The contentions regarding the allegedly undisclosed evidence relating to pretrial assistance to Francisco Cordova and Rafida Jabo-Cordova were and are outside the scope of the claims in the section 2255 motion . . . . Defendant certainly knew the scope of the claims and more specifically knew the scope of the matters on which the Court ordered a hearing and did not seek to amend the section 2255 motion at any point.

App. 36.

## SUMMARY OF ARGUMENT

Contrary to Dekelaita's contention, the district court acted well within its discretion in determining that he failed to establish a reasonable likelihood that the jury's verdict would have been different had it learned of the existence of a "mutual understanding" that agents would be available to provide client-witnesses with post-trial immigration-related assistance. The government presented substantial evidence against Dekelaita—including evidence in the form of recordings—and evidence showing that client-witnesses expected to remain in the United States despite the government's knowledge of their fraud. Moreover, defense counsel impeached client-witnesses on significant grounds, including past frauds they committed without Dekelaita's assistance. In light of this record, the district court, employing the proper legal standard, did not abuse its discretion in concluding that Dekelaita failed to prove materiality.

Regarding Dekelaita's claims that agents provided client-witnesses (and others) with different forms of pre-trial assistance warranting disclosure, the district court did not abuse its discretion in concluding that those claims were outside the scope of the § 2255 motion and, in any event, were immaterial to the jury's verdict.

## ARGUMENT

I.   **The District Court Properly Denied Dekelaita Relief Under § 2255 Because Any Undisclosed Benefit Was Not Reasonably Likely To Have Led to a Different Outcome.**

### A.   **Standard of Review**

"Appeals from the denial of § 2255 relief are governed by a dual standard of review. Factual findings are reviewed for clear error; issues of law get *de novo* review." *Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018).

A district court's finding of lack of materiality is reviewed for abuse of discretion, "in light of the full context of the weight and credibility of all evidence actually presented at trial." *United States v. Morales*, 746 F.3d 310, 316 (7th Cir. 2014) (citing *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995)).

### B.   **Analysis**

1.   **The District Court Did Not Abuse Its Discretion In Denying § 2255 Relief, Given Recorded Evidence, Testimony That Client-Witnesses Expected To Remain In the United States, and Significant Other Impeachment.**

Dekelaita does not dispute the district court's finding that agents made no "explicit or implicit promises . . . to witnesses before trial" regarding their future immigration status. Br. 29, 41. Dekelaita thus does not challenge the court's conclusion that his *Napue* and *Brady* claims "founder[ed]" because he could not establish "that any promises were made about the witnesses' future status." App. 26-27. That leaves only the court's determination that "the client-

39

witnesses had a mutual understanding with the OIG agents that they would be available for assistance" post-trial and that this understanding constituted a benefit the government should have disclosed. App. 32.[15]

To obtain a new trial based on an undisclosed benefit provided to a witness, defendant must establish that evidence of such a benefit was material. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *United States v. Jumah*, 599 F.3d 799, 808-09 (7th Cir. 2010). Materiality requires defendant to show prejudice: a reasonable likelihood that, but for the error, the proceeding's result would have been different. *United States v. Bagley,* 473 U.S. 667, 682 (1985).

The district court did not erroneously conclude that Dekelaita failed to satisfy this standard because (1) "significant evidence entirely unrelated to the credibility of the client-witnesses supported the verdict"; (2) "there was plenty of evidence that was submitted at the trial to impeach the client-witnesses"; and (3) any undisclosed benefit "did not involve an actual tangible benefit for any of the client-witnesses, but rather an offer of assistance (from an insider, to be sure) without any promise, implicit or otherwise, of a favorable outcome." App. 32-33. *See United States v. Jones and Schimenti*, Nos. 21-1482 & 21-1672,

---

[15] As it argued in the district court, the government does not agree that the record reflected the existence of any such "mutual understanding," or that the government was required to disclose any such understanding pre-trial. Nevertheless, the government argues for purposes of this appeal that, assuming the correctness of the district court's factual determinations on this issue, the court correctly determined that there was no reasonable likelihood that pretrial disclosure of any "mutual understanding" of future aid would have altered the jury's verdict.

2023 WL 5319244 (7th Cir. Aug. 18, 2023) ("We have a difficult time seeing how a pretrial disclosure . . . that the FBI planned to pay [a cooperator] a $50,000 bonus after trial would have created a likelihood of a different outcome," where there was "no express agreement between [the cooperator] and the FBI that he would be paid.").

*First*, the jury's verdict did not depend on the testimony of the client-witnesses. "[O]rdinarily, newly discovered impeachment evidence will not warrant a new trial under *Brady*," except for cases where the verdict rests "on the uncorroborated testimony of a single witness." *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009). This is not such a case. Objective evidence—two separate sets of recordings—proved Dekelaita's guilt.

Interpreter Benjamin was recorded falsely translating questions and answers during an asylum interview. *Supra* at 6-7, 26. Associate attorney Takhsh—whose testimony is wholly unaffected by Dekelaita's § 2255 motion—testified that he told Dekelaita about Benjamin's false translations and Dekelaita continued to use Benjamin as an interpreter. *Supra* at 7. A conspiracy between Dekelaita and Benjamin alone violates § 371. *See DeKelaita*, 875 F.3d at 859 (crediting evidence regarding Benjamin's false translation of Albqal's interview to affirm conspiracy conviction).

The recordings of the October 28, 2010 conversation between Dekelaita and Jabo-Cordova also unambiguously established Dekelaita's participation

in the charged fraud. *Supra* at 14-17. Dekelaita asked Jabo-Cordova about her husband—even though her asylum application stated she was single; instructed Jabo-Cordova to memorize her asylum story in preparation for a hearing; reminded her that she would "get in big trouble" if she said "it's not my story"; and instructed her to get a certificate from a church in Detroit with false information about her membership and attendance. *Id.* At the end of this conversation, when Jabo-Cordova asked Dekelaita if she needed to bring her Ecuadorian passport to court, Dekelaita responded: "I am not answering you the way I should. I don't know you are Ecuadorian. If I know you are Ecuadorian, we have to stop this [asylum] process." Tr. 642.

These recordings provided objective evidence of the fraud. Jurors could have disregarded all the other testimony and found Jabo-Cordova generally to be incredible, but still convicted Dekelaita by crediting these recordings. *See Jones and Schimenti*, 2023 WL 5319244, at *12 (affirming denial of new-trial motion based on post-trial disclosure of impeaching information, where the jury was presented with "recorded conversations and statements"); *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018) (where verdict was supported by recorded calls and physical evidence, additional immigration benefits to witness were immaterial).

*Second*, cumulative impeachment evidence is not material. This principle is particularly true where jurors already heard the purportedly newly

impeaching claims. *See Jones and Schimenti*, 2023 WL 5319244, at *12 (where "the jury already considered substantial evidence tending to impeach [cooperator's] motives," new evidence of post-trial benefits the cooperator received would not "have tipped the scales in favor of acquittal"); *accord United States v. King*, 910 F.3d 320, 328 (7th Cir. 2018); *Simental v. Matrisciano*, 363 F.3d 607, 613 (7th Cir. 2004). At trial, Dekelaita made the argument—quite forcefully—that the government and its witnesses had an understanding regarding the promise of future immigration-related assistance. Client-witnesses were cross-examined extensively about the possibility that they would be allowed to stay in the United States, which Dekelaita claimed provided a motive to testify against him. For example, on cross-examination, Najam acknowledged that he wanted to stay in the United States, but that his ability to remain depended on the government and its response to the lies he told to secure asylum. Tr. 871, 928-29. Saad was cross-examined at length about the fact that he lied repeatedly to remain the United States, agents knew that, and yet Saad and his family still "maintained [their] life in Michigan." Tr. 1096-1104.

Some witnesses *expressly* stated that they expected to remain in the United States after trial, their lies notwithstanding. Mosa was questioned about his understanding of his immigration status, including whether it would be affected by his testimony, and he responded he had "withholding of removal"

because "the situation currently is not very good in Iraq." Tr. 1204. He further

testified that he did not, in fact, understand that he and his family could be

deported based on fraudulent information in his asylum application. Tr. 1256-

57. Kouza was cross-examined about his expectation that he would be deported

and stated: "Our lives are threatened in Iraq and it's impossible to send us

back to Iraq unless the situation improves." Tr. 829. And Jabo-Cordova

explained that she intended to stay in the U.S. by seeking a green card based

on her husband's citizenship—exactly what she did. Tr. 659-60, 697-98.

Jabo-Cordova was further cross-examined about the temporary work

authorization she had received for approximately 10 years in exchange for her

cooperation and her desire to stay in the U.S. with her family post-trial.

Tr. 697-98. In addition, the trial ended *after* her deferred action expired, and

jurors were told that she still was not removed. Tr. 659, 1706-07. Defense

counsel argued in closing:

> [Jabo-Cordova], remember, she had the visa, it was extended until
> May 4th, and when we walked out of the courtroom when she was
> testifying, she'll probably be gone, from what they say. But
> miraculously, suddenly, surprisingly, she gets it extended. No
> promises. No promises. Maybe a wink. It doesn't matter because
> they are the only game in town. Only the government can do
> something to keep those people in the United States, and they
> know it, and the government knows it.

Tr. 1851. Defense counsel continued: "[H]er visa, supposed to have expired last

week . . . and she's still here . . .  She knows who holds all the cards, and all

the cards at this [government] table." Tr. 1860. In sum, jurors heard that client-witnesses did not want to be removed, did not expect to be removed, and had not been removed. Yet that evidence—far from proving case-dispositive—did not undermine the verdict.

*Third*, any impeachment value stemming from the undisclosed benefit identified by the district court—a promise of assistance, without any guaranteed outcome—was, as the court found, diluted by other, "significant" impeachment. App. 33. Substantial cross-examination was focused on discrediting client-witnesses due to their past frauds. Dekelaita's counsel elicited testimony and argued that the client-witnesses were perjurers (Tr. 964 (Albqal)); lied about their own names (Tr. 694-96 (Jabo-Cordova)); committed asylum fraud before ever meeting Dekelaita (Tr. 740, 747-48 (Cordova), 814-15 (Kouza), 1053-57 (Saad)); committed passport fraud, (Tr. 841 (Kouza)); committed fiancé fraud (Tr. 860-61 (Najam)); and lied on subsequent applications with which defendant was not involved (Tr. 1188-89 (Salman)). *See also* Tr. 1842-43 ("This is a case about serial liars across continents: Switzerland, Germany, Greece, Australia."); *id.* at 1844-45 (describing client-witnesses as "serial liars" who "lied to get here" and "will lie to stay here").

Defense counsel argued that because client-witnesses had engaged in fraud before ever meeting Dekelaita, they were capable of committing fraud without his assistance:

> Each government witness has admitted to numerous lies, numerous perjuries, false statements, far too voluminous for me to go over each one. . . . Of course they lied. And [the government] says [Dekelaita] told them to lie.
>
> Well, he wasn't in Iraq when Albqal was committing visa fraud. He wasn't in Iraq when Najam was committing visa fraud. He wasn't in Australia when one of the Salmans were committing visa fraud, or Switzerland, where [Jabo-Cordova] committed visa fraud. These people knew how to lie. And you know what? That's an art. Most people don't lie too well. They might fib a little bit, but you can't tell a big lie. We don't have it in our hearts. These people knew how to do it. And better than know how to do it, they know how to be convincing at it. They convinced trained embassy American consulate officials that they were going to get married, that they needed asylum. They know how to lie. Not a single one of them needed a liar coach.

Tr. 1848-49; *see also id.* 1842 ("Not a single one of them had learned anything from [Dekelaita] about lying."); *id.* at 1850, 1852.

Given this trial record, the district court properly concluded that had jurors learned that agents gave client-witnesses "an offer of assistance . . . without any promise, implicit or otherwise, of a favorable outcome," such evidence would not "have tipped the scales in favor of acquittal." *See Jones and Schimenti*, 2023 WL 5319244, at *12.

## 2.   Dekelaita's Efforts To Find Error In The District Court's Materiality Determination Fail.

Dekelaita's arguments regarding the district court's materiality analysis fall short. Br. 46-51.

He argues the recorded evidence was not as strong as the district court characterized it (Br. 49-50) and that Takhsh's testimony regarding Benjamin's false translations—which Dekelaita knew about and employed Benjamin nonetheless (Br. 48-49)—was compromised by Takhsh's immunity and Takhsh's own hiring of Benjamin. The jury heard this evidence and argument. *E.g.*, Tr. 1859-60 ("[I]f you listen to those tapes, Robert's grasping, he hasn't seen [Jabo-Cordova] in years . . . He's not telling her to lie."); Tr. 302-03 (discussing Takhsh's immunity); Tr. 382-83 (discussing Takhsh's employment of Benjamin). On appeal, Dekelaita does not explain how recorded statements could be compromised by any promise of assistance, or how any such promises would have influenced Takhsh, who was never subject to removal from the United States.[16]

With respect to Takhsh's testimony regarding the Yaldiko affidavit, Dekelaita does not dispute that he directed Takhsh to fabricate it. He contends only that the affidavit never found its way into Jabo-Cordova's A-file (Br. 48), which does nothing to undercut Dekelaita's role in furthering the conspiracy. *See* Seventh Circuit Pattern Instructions, Criminal, 5.09, Conspiracy— Definition of Conspiracy ("A conspiracy may be proven even if its goals were

---

[16] The district court erroneously referenced Benjamin's trial testimony (which Benjamin did not provide). App. 32. Still, Dekelaita does not argue why this error constitutes an abuse of discretion, given the recording and Takhsh's testimony regarding conversations with Dekelaita about Benjamin's false translations.

not accomplished."); *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999) ("The government does not have to show that the goal of the conspiracy was accomplished."); *see also* R. 136 at 10 (alleging that affidavit's creation constituted an overt act in furtherance of the conspiracy).

Dekelaita argues that had the jury known of promised assistance, the government would have been unable to argue during closing that the client-witnesses' prior frauds "would actually hurt their chances of not being deported when, it turns out, the exact opposite was true." Br. 44-45. But "the exact opposite" was not true. In denying Dekelaita's § 2255 motion, the district court expressly found—in findings that Dekelaita does not dispute (Br. 41)—that "[t]here was no pretrial understanding that the agents would stall [the client-witnesses'] deportation, that the agents or other authorities would enable them to stay in the U.S. indefinitely or even for any significant period, or that the witnesses would receive any actual consideration from immigration authorities regarding their status" (App. 31). Moreover, jurors already heard from client-witnesses themselves that they expected to remain in the United States despite the government's knowledge of their lies. *Supra* at 18-19, 24, 43-45.

Finally, Dekelaita argues that the district court "applied the wrong standard" of materiality. Br. 47. But the court recited the standard from *Bagley*, 473 U.S. at 682, 685: "a new trial is required if the defendant shows a

reasonable likelihood that the outcome of the trial would have been different but for the error (App. 31); and adhered to it as well.

In *Kyles v. Whitley*, the Supreme Court explained:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. 419, 434 (1995) (internal citations omitted). The district court assessed whether Dekelaita received a fair trial consistent with these principles. It considered the recorded evidence—evidence that, reasonably, jurors would not have viewed differently even with additional disclosures. App. 33. And it considered the significant impeachment already leveled against, and disclosures made about, client-witnesses. *Id.* Having done so, the court appropriately concluded that it was "not persuaded that Dekelaita has shown that this is material, in other words that disclosure of this (and the resulting ability to cross-examine about it) is reasonably likely to have made a difference in the outcome of Dekelaita's trial." *Id.*

Defendant focuses on one line in the court's analysis, which referenced "significant evidence entirely unrelated to the credibility of the client-witnesses [that] supported the verdict." App. 33; Br. 47. That sentence does not

reflect the extent of the court's materiality determination. Nor does *Bagley* prohibit courts, when assessing materiality, from considering the inculpatory evidence, especially inculpatory evidence "uninfected" by nondisclosure. This Court has explained:

> [T]he standard that we have articulated requires first the district judge, and then this court in reviewing his ruling for possible abuse of discretion, to examine the trial record as a whole, *considering not only the parts of the record infected by the government's improprieties but also the untainted evidence that the jury heard.* Although it is not enough that the untainted evidence be sufficient for conviction, *that evidence must not be ignored* in the making of the determination whether there is a reasonable likelihood that the outcome would have been different had the government not misbehaved.

*United States v. Williams*, 81 F.3d 1434, 1438 (7th Cir. 1996) (citing *Kyles*, 514 U.S. at 435, n.8) (emphases added); *accord United States v. Jackson*, 780 F.2d 1305, 1310-11 (7th Cir. 1986) ("the materiality determination is not to be made in a vacuum; rather it must be made in the context of all the evidence introduced at trial"); *United States v. Reyes,* 270 F.3d 1158, 1166 (7th Cir. 2001) (materiality standard not met by "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial"); *United States v. Johnson*, No. 6:14-CR-00482-MC, 2019 WL 267875, at *4 (D. Or. Jan. 17, 2019) (undisclosed pretrial conversation about immigration benefits immaterial where witnesses admitted at trial their interest in immigration benefits).

The district court—which presided over Dekelaita's criminal trial and § 2255 proceedings—did not abuse its discretion in determining that, given the trial record, an undisclosed mutual understanding of future assistance did not undermine confidence in the verdict.

## II. The District Court Properly Denied § 2255 Relief Based on Dekelaita's Additional Claims That Agents Assisted Client-Witnesses and Others Before Trial, Where Those Claims Were Untimely and Immaterial.

### A. Standard of Review

This Court reviews a district court's disposition of a motion to amend a pleading that turns on the "relation-back" provision of Federal Rule of Civil Procedure 15(c) for an abuse of discretion. *See Coleman v. United States*, Appeal No. 22-1678, 2023 WL 5212586, at *3 (7th Cir. Aug. 15, 2023).

### B. Background

In addition to claiming that the government failed to disclose promises of post-trial assistance to client-witnesses, Dekelaita claimed the government failed to disclose certain "pre-trial" benefits. CVR 131 at 10-11, 18-20. He contended: (1) pre-trial, Agent Shoudy provided Cordova, Jabo-Cordova's husband, with immigration-related assistance; (2) pre-trial, Agent Chesla assisted Jabo-Cordova by expediting her Form I-130; (3) pre-trial, Agent Chesla knew but did not take action against a different immigration attorney, Kejbou, who assisted Jabo-Cordova in submitting a false immigration petition;

and (4) pre-trial, DHS-OIG agents "looked the other way" regarding fraud purportedly committed by Esho and Esho's wife. *Id.*; Br. 32-34.

The district court denied relief on these claims. It held they were "outside the scope" of Dekelaita's § 2255 motion, which concerned benefits of post-trial assistance to client-witnesses and which Dekelaita never sought to amend, and that in any event, "none of that particular allegedly undisclosed information was material, even when viewed collectively." App. 5; App. 36.

### C. Analysis

#### 1. The District Court Did Not Err In Concluding That Dekelaita's Claims Regarding Purported Pre-Trial Benefits Did Not "Relate Back" To His § 2255 Motion.

Under Federal Rule of Civil Procedure 15(a)(2), when a party seeks to amend its pleading, courts "should freely give leave when justice so requires." Although the Supreme Court has interpreted this rule "liberally," it is limited by the applicable statute of limitations. *See Coleman*, 2023 WL 5212586, at *3 (citing *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357-58 (7th Cir. 2015), and *Mayle v. Felix*, 545 U.S. 644, 655 (2005)). "Where a party seeks to amend a pleading after the statute of limitations has run, he must turn to the relation-back provision of Rule 15(c)." *Id.* That rule "allows such amendment if it 'asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'" *Id.* (citing Fed. R. Civ. P. 15(c)(1)(B)).

52

Dekelaita does not argue that he asserted his claims regarding undisclosed pre-trial benefits within the one-year statute of limitations for filing a § 2255 motion. S*ee* 28 U.S.C. § 2255(f)(1). He concedes that he first advanced these contentions in a February 2021 brief filed more than a year after this Court's November 2017 decision affirming Dekelaita's conviction became final. Br. 35 (citing CVR 121)); Appeal No. 17-1644, Dkt. 40. Dekelaita's claims regarding pre-trial benefits only would have been properly before the district court if they "related back" to claims made in his § 2255 motion regarding post-trial benefits.[17]

But Dekelaita does not advance a "relation back" argument in his opening brief; any such argument is thus waived. *See United States v. Vargas-Garnica*, 332 F.3d 471, 473 n.1 (7th Cir. 2003). Nor could he do so successfully. Dekelaita never moved in the district court to amend his pleadings under Rule 15(c). He cannot now credibly contend that the court abused its discretion in failing to award relief Dekelaita never sought.

Moreover, an amendment does not relate back merely because it "relate[s] to the same trial, conviction, or sentence as a timely filed claim."

---

[17] Defendant also does not contend that the one-year statute of limitations should have been equitably tolled. *See Holland v. Florida*, 560 U.S. 631, 645, 649 (2010) (for equitable tolling, a petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing").

*Mayle*, 545 U.S. at 662. And it does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Beason v. Marske*, 926 F.3d 932, 938 (7th Cir. 2019). Instead, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims" and involves only a change in legal theory. *Mayle*, 545 U.S. at 659, 664.

Here, there is no common core of operative facts. Defendant's § 2255 motion claimed that, *following trial*, "[w]itnesses . . . were rewarded for their testimony by being allowed to retain their admittedly fraudulent/frivolous Asylum Status." CVR 3 at 3. After the evidentiary hearing, he added claims that, *before trial*, client-witnesses, a client-witness's wife, and a client-witnesses' lawyer purportedly received other benefits related either to their status in this country or past criminal acts. Those factual claims involve different time periods, different purported benefits, and, in some cases, different purported beneficiaries than alleged in Dekelaita's § 2255 motion. *Contra Coleman*, 2023 WL 5212586, at *5 (claim that counsel failed to research whether prior convictions supported an enhancement under 21 U.S.C. § 851 related back to claim that counsel failed to inform petitioner of § 851 notice altogether). The district court thus did not abuse its discretion in concluding that the belatedly raised claims were "outside the scope" of the § 2255 motion.

Arguing to the contrary, Dekelaita maintains that he was not required to satisfy § 2255(f)(1)'s one-year time-limitation because he gathered evidence relevant to his untimely claims through discovery and the evidentiary hearing. Br. 37-39. Dekelaita cites *Torry v. Northrop Grumman Corp.*, 399 F.3d 876 (7th Cir. 2005), to support that contention, but *Torry* is inapposite. Br. 39. *Torry* explained that under Rule 15(b), "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." 399 F.3d at 878. *Torry* did not pertain to Rule 15(c) and did not involve a statute of limitations, the procedural hurdle Dekelaita faces.

Dekelaita also contends that the government "forfeited" procedural objections to his untimely claims. Br. 37, 39. It did not. When responding to his § 2255 motion, the government argued that Dekelaita was "procedurally barred" from advancing claims that he failed to pursue on direct appeal. CVR 5 at 7. The district court overruled that objection to the extent that "the passage of time has been key to assessing whether an improper benefit was conferred on the witnesses" (*i.e.*, an ability to remain in the United States). CVR 8 at 6-7. "The passage of time," however, does not excuse Dekelaita's failure to  raise claims regarding pre-trial benefits. Put another way, the government did object—from the outset of the § 2255 proceedings—to Dekelaita's efforts to bring untimely claims. And the government continued to object in its post-

hearing brief. CVR 124 at 18 (claim regarding Esho's purported fraud "is far outside the scope of the § 2255"); *id.* at 19 (claim regarding Jabo-Cordova's I-130 petition "was available" at trial); *id.* at 27 (claim regarding Kejbou "is beyond the scope of the § 2255 motion").[18]

Finally, Dekelaita does not acknowledge a court's ability to examine, on its own initiative, the timelines of a habeas claim. *See Anderson v. United States*, 981 F.3d 565, 571-72 (7th Cir. 2020) (citing *Wood v. Milyard*, 566 U.S. 463, 471, 473 (2012)). Admittedly, "this discretion is limited," and this Court has declined to exercise it where the government never argued untimeliness in the district court, or where the district court invested time in resolving a habeas case on the merits rather than on "threshold procedural grounds" that the parties never teed up. *Id.* These factors are not present here. Thus, even if this Court concluded the government forfeited an argument that Dekelaita's claims regarding pre-trial benefits were untimely, the district court still was permitted reach that conclusion. Indeed, that court—which invested considerable time in resolving Dekelaita's § 2255 motion—was well-positioned to do so.

---

[18] The government similarly objected during the evidentiary hearing. *E.g.*, H. Tr. 16 ("Ms. Kejbou is not herself a trial witness, and any questions about her are outside the scope."); *id.* at 100 (objecting to questions to Esho that do not "relate[] to post trial benefits"); *id.* at 103, 110, 112.

### 2.    Dekelaita's Claims Regarding Purported Pre-Trial Benefits Fail On The Merits.

Procedural deficiencies aside, the district court correctly concluded that Dekelaita failed to show a reasonable likelihood that, had the jury learned of the alleged pre-trial benefits, the proceeding's result would have been different. App. 5.

### a.    Cordova's Naturalization Application

Dekelaita argues that before trial, Agent Shoudy assisted Cordova (husband of Jabo-Cordova) by resolving an issue associated with Cordova's abandonment of his green card bearing on Cordova's ability to become a naturalized citizen. Br. 32-33. The record does not support this claim, which even if true, would be immaterial to the jury's verdict.

Testimony introduced at the evidentiary hearing from USCIS supervisor Tracy Plante reflected that USCIS recommended Cordova's naturalization without DHS-OIG's input or knowledge of Jabo-Cordova's cooperation. CVR 124 at 20, 22-23 (citing Plante's deposition at 12, 34-35, 43-44 (available at CVR 74-7)). Furthermore, Agent Shoudy never testified that he assisted Cordova in obtaining a green card owing "at least in part to his wife's

cooperation in the investigation." *Contra* Br. 10, 32, 45.[19] Rather, Shoudy

testified that DHS-OIG "had nothing to do with" Cordova's naturalization

application and that he provided USCIS with a copy of Cordova's Form I-90

(an application for a replacement green card) simply because he did not want

USCIS "approving a . . . naturalization application if there had been fraud"

reflected on that form. CVR 124 at 22-23 (citing H. Tr. 861, 865-67, 872-74,

886); *see also* H. Tr. 907-08. Shoudy did testify that he provided USCIS notes

from a 2008 interview he conducted documenting Cordova's previous absence

from the United States. H. Tr. 866-67, 874. But providing notes identifying

Cordova's absence (which Dekelaita claimed in the district court made Cordova

*ineligible* for citizenship, *see* CVR 121 at 18) would have made approval of

Cordova's naturalization application *less*, not *more*, likely.

Even if USCIS somehow departed from ordinary procedures in renewing

Cordova's green card based on Shoudy's intervention, that matter was fully

---

[19] In representing to the contrary, Dekelaita appears to rely on an exchange during
the evidentiary hearing in which his counsel asked Shoudy: "But you stepped in to
try to help Mr. Cordova because . . . he and his wife were cooperating in the Dekelaita
investigation, correct?" H. Tr. 874. Shoudy answered: "I stepped in to help them do
what?" *Id.* Defense counsel then asked: "Well, you communicated with [USCIS]
because Mr. Cordova and his wife were cooperating in your investigation, correct?"
*Id.* Shoudy responded: "Not so much him. I don't think he was cooperating at the
time. She was cooperating in that and other investigations, yes." *Id.* This is not the
admission by Shoudy that Dekelaita makes it out to be, particularly when juxtaposed
with testimony that Shoudy corresponded with USCIS regarding Cordova only to
make sure the agency had "all of the information it needed to properly make a
determination about the application for naturalization." H. Tr. 907.

aired at trial. Dekelaita elicited Cordova's acknowledgement that he was outside the country for more than a year and thus would have been ineligible for a visa limited to persons absent for less than a year; he then intimated to the jury that the government must have provided assistance for that to happen. Tr. 749-51.

Finally, Dekelaita points to no evidence that Cordova knew about Shoudy's communications with USCIS, as necessary to establish the effect that any such benefit would have had on Cordova's testimony. *See Jones and Schimenti*, 2023 WL 5319244, at *11-12 (court had "a difficult time seeing how a pretrial disclosure" regarding a benefit the cooperator did not know about "would have changed the jury's ultimate guilt of determination"). *Shelton v. Marshall*, 796 F.3d 1075 (9th Cir. 2015), does not hold otherwise. Br. 42-43. In *Shelton*, the prosecutor and a witness's attorney agreed to delay psychiatrically examining the potentially incompetent witness until after trial because the witness's testimony was critical to the prosecution; in exchange, the prosecutor dropped murder charges against the witness. *Id.* at 1082. *Shelton* suggests that the witness knew about the deal (*e.g., id.* at 1084, 1088), but even if he did not, the undisclosed evidence in *Shelton* was that the prosecutor concealed "the potentially devastating fact that the state itself doubted [the witness's] mental competency," not that the witness received this benefit. *Id.* at 1086, 1089.

### b.    Jabo-Cordova's I-130 Application

Dekelaita concedes that pre-trial, the government disclosed that Cordova filed on Jabo-Cordova's behalf a Form I-130, Petition for Alien Relative, approved by USCIS in 2014. Br. 33. Dekelaita maintains, however, that the government also should have disclosed a pretrial request by Chesla to expedite USCIS's consideration of the Form I-130.

But the approval of a Form I-130 confers no benefit—it is "the first step in helping an eligible relative apply to immigrate," by establishing the existence of a family relationship between two people but does not itself "give [the] relative any immigration status or benefit." USCIS, I-130: Petition for Alien Relative, *available at* https://www.uscis.gov/i-130. *See, e.g.*, *Mamedov v. Barr*, 2021 WL 781743, at *1 (E.D.N.Y. Mar. 1, 2021) (noting that the petition's approval does not give "any immigration status or benefit"). Here, the granting of the Form I-130 simply established the Cordovas' marriage.

Dekelaita also does not contend that Jabo-Cordova knew of any overtures to USCIS by Chesla on her behalf. As explained above, without such knowledge, there could be no effect on Jabo-Cordova's testimony, let alone one that materially affected the jury's verdict.

Dekelaita argues that this particular claim, if true, nonetheless undermined Chesla's credibility and, more broadly, "the integrity of the investigation." Br. 45; *id.* at 42 (arguing that Chesla's intent mattered even if

he did not convey his plans to a witness). But while Chesla was one of two case agents in Dekelaita's investigation, his role at trial was largely confined to laying foundation for the admission of recorded statements, other agency documents, and a chart summarizing facts related to the client-witnesses' asylum applications (e.g., mailing and filing dates). *See generally* Tr. 148-214, 1661-1703. Dekelaita does not explain how any role Chesla played in expediting Jabo-Cordova's I-130 application would have so compromised Chesla's ability to lay the foundation for such exhibits, especially where jurors heard that Jabo-Cordova remained in the U.S. while she cooperated and even after her deferred-action status expired. Tr. 227-29, 1706, 1851, 1860.

### c.    Kejbou

Dekelaita complains that the government did not disclose that Kejbou— Jabo-Cordova's other immigration attorney—had a federal criminal conviction. Br. 45. Even assuming Dekelaita was unable to discover this publicly available information on his own, he does not explain why the government had discovery obligations as to Kejbou, who was not a witness.[20]

Dekelaita also suggests that applications Kejbou filed on Jabo-Cordova's behalf containing fraudulent statements regarding her manner of entry would

---

[20] *See Price v. Thurmer*, 514 F.3d 729, 731-32 (7th Cir. 2008) (no government obligation to disclose indictment of witness where it was a "matter of public record readily accessible to [lawyers]"); *Lee v. Watson*, 964 F.3d 663, 667 (7th Cir. 2020) (no valid *Brady* or *Napue* claim where the claimed suppressed evidence was public court record "available with reasonable diligence").

have affected the verdict by underscoring that Jabo-Cordova was capable of committing fraud without Dekelaita's assistance. Br. 34, 44, 46. But Dekelaita's counsel did advance that argument. *Supra* at 45-46. Moreover, the fact that Jabo-Cordova committed fraud *with another attorney's assistance* would have underscored Dekelaita's essential role in the charged conspiracy.

Finally, Dekelaita's asserts that Chesla's credibility would have been affected by the applications prepared by Kejbou lacks merit. Even assuming that Chesla was aware that the Kejbou-prepared documents contained false statements, this fact could not have affected the verdict for the same reasons noted above.

### d.    Esho

Dekelaita vaguely asserts that the government withheld evidence that "DHS-OIG agents . . . looked the other way at Esho's family immigration fraud," which occurred before trial (Br. 35), and argues that evidence of this fraud could have been used to impeach Esho, agents, and the investigation's "integrity" (Br. 46). Dekelaita says no more, thus waiving this argument on appeal. *United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022). Waiver aside, as detailed above, client-witnesses were already impeached regarding

their past frauds, and Dekelaita sets out no evidence that agents knew of any

prior fraud by Esho.[21]

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

judgment.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

STUART D. FULLERTON
Assistant United States Attorney

/s/ *Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

---

[21] With respect to Esho's wife, there was no reason for the government to obtain and disclose information about her immigration status. She was not represented by Dekelaita, was not interviewed pretrial by DHS-OIG, did not testify at trial, and did not receive immigration benefits from the government. H. Tr. 115, 691-702, 806.

## RULE 32 CERTIFICATION

I hereby certify that:

1.   This brief contains 14,908 words. On September 6, 2023, this Court granted the government's motion to file an oversize brief containing up to 15,000 words. Dkt. 33.

2.   This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

<div style="margin-left: 40%">

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

</div>

By:        /s/ *Georgia N. Alexakis*
<div style="margin-left: 40%">

GEORGIA N. ALEXAKIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-0974

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023 I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:  /s/ *Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-0974